**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey, Esq. (California Bar No. 295032)
yeremey@skclassactions.com
Brittany S. Scott, Esq. (California Bar No. 327132)
brittany@skclassactions.com
28 Geary Street, Suite 650 # 1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: 888-410-0415

**SMITH KRIVOSHEY, PC**
Joel D. Smith (California Bar No. 244902)
E-Mail: joel@skclassactions.com
867 Boylston Street, 5thFloor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404

Attorneys for Plaintiff, LACEY TIMMINS
Additional Attorneys in Signature Block

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACEY TIMMINS, individually, and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNILEVER UNITED STATES, INC., a Delaware corporation,<br><br>Defendant. | Case No. 2:24-cv-03017-DJC-JDP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Daniel J. Calabretta |

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                    1

## <u>NATURE OF ACTION</u>

1.      This class action seeks to hold Defendant Unilever United States, Inc. accountable for falsely labeling and marketing its Vaseline brand Baby Healing Jelly (the "Product") as "hypoallergenic" and "Pediatrician Recommended."[1]

2.      Allergic contact dermatitis is the fifth most prevalent skin disease in the U.S., exceeding $1.5 billion in direct annual medical costs. Between 1996 and 2016, the prevalence of dermatitis caused by personal care products increased by almost 300%. As much as 70% of the U.S. population is allergic to at least one personal care product ingredient. According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012, with 14.2% of children ages 0-4 affected.

3.      Identifying allergens can be difficult because reactions are attenuated in both space and time. Some reactions manifest a week after exposure, and the immune system can sometimes "remember" the initial exposure, causing reactions to appear later on the originally exposed body part even when a different product is applied elsewhere. In other cases, cross-reactivity can cause the immune system to have an allergic reaction to something new by mistaking it for a structurally similar allergen from a previous exposure. Antibodies recognize shared, similar protein shapes, leading to symptoms upon first contact despite no prior exposure to that specific allergen.

4.      Consequently, consumers with sensitive skin and skin conditions increasingly seek out and rely on terms like "hypoallergenic" when making purchasing decisions about skin care and hygiene products. Those without allergies seek hypoallergenic products to avoid developing sensitivities; those with allergies

---

[1] The Product is sometimes marketed as Vaseline brand Hypoallergenic Newborn Baby Oil Diaper Rash Cream, Healing Petroleum Jelly, Vaseline Healing Jelly, Petroleum Jelly for Diaper Rash, Moisturizer for Baby, and Hypoallergenic Skin Protectant on various third-party retailers. However, these products all bear the same packaging and labeling, and are one and the same.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                1

seek hypoallergenic products to avoid inflammatory responses from unidentified allergens.

5.    This case involves Defendant's widespread, deceptive use of the term "hypoallergenic" on the Product's labels and marketing materials. The Product's front label prominently represents to consumers that the Product is "Hypoallergenic." On Defendant's website and the websites of other retailers that sell the Product, Defendant also claims the Product is "gentle on skin," "a gentle and pure skin care moisturizer that helps treat and prevent chafed skin from diaper rash," "a trusted skin care product that adds a soothing and protective barrier to help relieve baby's discomfort," and "gentle enough to treat dry skin on baby's face and body."[2]

6.    However, these representations are false. The truth is the Product is not hypoallergenic because it contains fragrance chemicals in amounts that can reasonably be expected to induce an allergic response in a significant number of the Product's intended users (*i.e.*, babies, and particularly babies or children who have sensitive skin). Indeed, fragrance is one of the most common allergens and skin irritants, and a leading cause of allergic contact dermatitis according to the American Academy of Dermatology ("AAD"). The AAD estimates about 2.5 million Americans have fragrance allergies. Many fragrance chemicals also share similar structural features, which contributes to cross-reactivity.

7.    As a result of the Product's ingredients, the Product is also just as likely and, for some products, *more* likely to cause an allergic reaction in its intended users than similar, competing products which do not claim to be hypoallergenic. An example is Defendant's own Vaseline brand Original Healing Jelly, which contains neither fragrance chemicals nor a label representation that the product is "Hypoallergenic." Indeed, the only difference between the Product and Vaseline's

---

[2] *See*, *e.g.*, Exhibit A.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                    2

Original Healing Jelly is Defendant's inclusion of fragrance chemicals and hypoallergenic claims.

8. The Product is also far more likely to cause an allergic reaction in its intended users than similar, competing products which claim to be hypoallergenic on their labels and, in fact, contain no fragrance or other skin sensitizers. An example is Walmart's Equate Baby Petroleum Jelly, which has a "Hypoallergenic" claim on its front label, is designed for use on babies, is comprised of 100% White Petrolatum, and contains zero fragrance chemicals or other skin sensitizers. Another example is Target's Up & Up Petroleum Jelly, which also claims to be "Hypoallergenic" on its front label and contains no fragrance chemicals or other skin sensitizers.

9. The Product's second prominent, front-label claim—"Pediatrician Recommended"—is also false and deceptive. There is no study or evidence suggesting a pediatrician has ever recommended this Product to consumers. The claim is not just misleading, it is false. In fact, pediatricians and dermatologists strongly favor fragrance-free products for babies and children (and particularly so for babies and children with eczema, skin allergies, or other sensitive skin conditions), and advise avoiding added fragrance as a common irritant and potential allergen. The American Academy of Pediatrics ("AAP") advises using fragrance-free, gentle cleansers and moisturizers and avoiding skin irritants like fragranced soaps and detergents in children with eczema. Similarly, the AAD recommends choosing fragrance-free rather than "unscented" products for children with eczema, noting that even masked fragrances can provoke flares.

10. By deceiving consumers about the nature, quality, and/or ingredients of its Product, Defendant takes away market share from competing products and has increased its own sales and profits. Consumers lack the ability to test or independently ascertain the potential for allergic contact dermatitis at the point of sale. Reasonable consumers must and do rely on Defendant and its competitors to honestly report the nature of their products and ingredients.

11.    Plaintiff brings this action individually and on behalf of similarly situated consumers who purchased the Product that was falsely and misleadingly labeled and marketed as "hypoallergenic" and "Pediatrician Recommended." Plaintiff seeks to represent a California class seeking damages, interest thereon, reasonable attorney fees and costs, restitution, equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the Product. Plaintiff makes these allegations based on her personal knowledge as to herself and her own acts and observations and, otherwise, on information and belief based on investigation of counsel.

## **PARTIES**

12.    Plaintiff Lacey Timmins is domiciled in California. Plaintiff purchased the Product in 2023 from Target in Turlock, Stanislaus County, California. Plaintiff purchased the Product because her son had eczema and diaper rash, and she believed the Product would help treat her son's skin and alleviate symptoms. The Product did not help treat her son's skin or alleviate his symptoms, however, and in fact prolonged them.

13.    Plaintiff reviewed and relied on the Product's packaging before buying it, including the representation that the Product was purportedly "Hypoallergenic" and "Pediatrician Recommended."

14.    If Plaintiff had known the Product was falsely labeled and was not in fact hypoallergenic or recommended by pediatricians, Plaintiff would not have bought it or would have paid less.

15.    In other words, Plaintiff would not have purchased the Product at all, or would not have purchased the Product on the same terms or for the same price, had she known: (a) that the Product was not hypoallergenic as advertised; (b) that the Product contained skin sensitizers or allergens in sufficient quantities to cause skin

irritation or corrosion or contact dermatitis in its intended users; (c) that the Product contained fragrance chemicals in amounts that can reasonably be expected to induce an allergic response in a significant number of the Product's intended users; (d) that the Product is just as likely and, for some products, more likely to cause an allergic reaction in its intended users than similar, competing products which do not claim to be hypoallergenic; (e) that the Product is more likely to cause an allergic reaction in its intended users than similar, competing products which claim to be hypoallergenic on their labels and, in fact, are hypoallergenic when compared to the Product because they omit fragrance chemicals; and/or (f) that pediatricians do not recommend the Product for its intended use.

16.     Plaintiff remains interested in purchasing similar healing jelly products that are truly hypoallergenic and recommended by pediatricians. Plaintiff also remains interested in purchasing, and would purchase, the Product at issue in this case if it were labeled truthfully. However, she cannot know for certain whether the false labeling of the Product has been or will be corrected. The composition of the Product may change over time, but if Defendant continues to make the representations at issue here, then, when presented with false or misleading information while shopping, Plaintiff will be unable to make informed decisions about whether to purchase the Product. Plaintiff is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product's marketing is accurate and no longer has the tendency or capacity to deceive or confuse reasonable consumers.

17.     Defendant Unilever United States, Inc. is a Delaware corporation with its principal place of business in Hoboken, New Jersey. Defendant manufactures, advertises, distributes, and sells the Product under its brand Vaseline, both online at sites like www.walmart.com, www.amazon.com, www.target.com, and www.meijer.com, and at myriad brick-and-mortar retailers and supermarkets throughout the United States. The Product includes the Vaseline logo and name, and

is sold in 13 oz and 1.75 oz tubs, 2.89 oz tubes, and possibly other sizes and configurations. Defendant is responsible for the labeling of the Product and its formulation, as well as all marketing materials and language that accompanies the Product on sites where the Product is available for sale.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendant.

19.     This Court has personal jurisdiction over Defendant because Defendant's contacts with the forum are continuous and substantial, and Defendant otherwise intentionally availed itself of the laws of this state through the marketing of the Product at issue in California to consumers in California and through sales of the Product in California to consumers in California, so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice. A substantial portion of the events giving rise to the claims alleged here occurred in this state.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and because Defendant engages in continuous and systematic business activities within this District.

## FACTUAL ALLEGATIONS

**A.      The Hypoallergenic Product Market**

21.     According to the CDC, 8.8 million children (12% of U.S. children) reported skin allergies in 2012. Skin allergies are even more prevalent among young children; CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.

22.     These numbers are likely to underreport the prevalence of allergic contact dermatitis. Recent studies show that somewhere between 14-70% of children suffer from skin allergies, based on positive patch skin tests.

23.     Skin allergies are similarly prevalent among adults.

24.     A significant portion of the U.S. population has allergies that are triggered by skin care products. Allergic contact dermatitis is the fifth most prevalent skin disease in the U.S.[3] Personal care products such as soaps, lotions, and fragrances frequently contain ingredients that may cause allergic contact dermatitis. The prevalence of dermatitis related to personal care products increased by almost 300% between 1996 and 2016.

25.     Over the last decade, retail chains have become the most prolific manufacturers, marketers, and distributors of so-called "natural," "clean," and "hypoallergenic" personal care products, accounting for just over 40% of world-wide revenue in 2019. However, the U.S. Food and Drug Administration ("FDA") has not defined or regulated the terms "natural," "clean," or "hypoallergenic," resulting in sellers and manufacturers freely advertising with these terms to imply safety and health benefits to unsuspecting consumers.

26.     Given the increased prevalence of allergic contact dermatitis and other skin conditions, there is no question consumers increasingly seek the presence of such terms on product labels when shopping for themselves and their children. Those who do not already suffer from skin allergies seek hypoallergenic products to avoid developing skin allergies. Those who do suffer from skin allergies, or have children who suffer from skin allergies, seek hypoallergenic products to avoid unknown and/or hidden allergens that will exacerbate or prolong their conditions.

---

[3] Young PA, Gui H, Bae GH. Prevalence of Contact Allergens in Natural Skin Care Products From US Commercial Retailers. JAMA Dermatol. 2022;158(11):1323–1325. doi:10.1001/jamadermatol.2022.3180, https://jamanetwork.com/journals/jamadermatology/fullarticle/2795927

27.    Vulnerable consumers, such as parents of children with skin sensitivities and individuals with histories of allergic reactions, are thus subject to exploitation by manufacturers of these products.

28.    Consumers are willing to pay more for products labeled "hypoallergenic." In reality, so-called "hypoallergenic" products may contain the same potential allergens as their standard counterparts, or may simply have replaced common allergens with less-studied ingredients that pose their own risks.

29.    When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized." Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic contact dermatitis. These include redness, oedema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavity), and eventually oozing.

30.    Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization. People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will avoid public spaces entirely. In either case, the skin allergies can dramatically affect a person's confidence and engagement in life.

31.    It is difficult to identify the substance causing an allergic response. Allergic contact dermatitis develops several days after exposure to a skin allergen. Some substances do not cause symptoms until a week after exposure.

32.    Once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the original site of sensitization. For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response could occur on the face, even if the face was never exposed to the second product.

33.    In other cases, cross-reactivity can cause the immune system to have an allergic reaction to something new by mistaking it for a structurally similar

allergen from a previous exposure. Antibodies recognize shared, similar protein shapes, leading to symptoms upon first contact despite no prior exposure to that specific allergen. Many fragrance chemicals share similar structural features, which contributes to cross-reactivity.

34.    When a consumer cannot identify the material to which they are allergic, allergic contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.

35.    Thus, consumers actively seek out hypoallergenic and purported sensitive skin products—to avoid a skin allergy from occurring at all and/or to prevent a known skin allergy from repeating the inflammatory cascade.

36.    Consumers also generally interpret a label claim like "Pediatrician Recommended" as a strong endorsement of safety and efficacy from medical experts, implying that many pediatricians have specifically evaluated and favor that product for children and babies (including those with eczema, allergies, and other sensitive skin conditions) over other available, competing products.

**B.    Defendant's Marketing Claims**

37.    Defendant manufactures, markets, and sells the Product both online and at brick-and-mortar locations of various retailers throughout the U.S.

38.    Defendant bases the Product's marketing scheme on appealing to consumers seeking hypoallergenic skin products. The Product is frequently purchased by consumers whose newborn and young children suffer from eczema and diaper rash. The Products' various front labels prominently represent to consumers that the Product is purportedly "Hypoallergenic," alongside claims of being "Pediatrician Recommended," "3X Purified," and "Purity Guaranteed":









39.    On websites where the Product is sold, Defendant reinforces these claims, describing the Product as "gentle on skin," "a gentle and pure skin care moisturizer that helps treat and prevent chafed skin from diaper rash," "a trusted skin

care product that adds a soothing and protective barrier to help relieve baby's discomfort," and "gentle enough to treat dry skin on baby's face and body." *See, e.g.*, Exhibit A.

40. On the Product's back label, hidden in small print on the lower right side of the panel that reasonable consumers are not likely to notice, Defendant lists fragrance as an inactive ingredient. Plaintiff has added the red arrow for reference below:



## C. Definitions of Hypoallergenic

41. Merriam-Webster defines "hypoallergenic" as "having little likelihood of causing an allergic reaction," while Dictionary.com defines the term as "designed to reduce or minimize the possibility of an allergic response . . . ."

42. Further, the prefix "hypo-" means "less than" and implies a relative relationship.

43. Thus, the term "hypoallergenic" on the Product's label communicates to reasonable consumers that the Product is less likely to cause an allergic reaction in its intended users than similar, competing products which do not claim to be hypoallergenic.

44. The term "hypoallergenic" on the Product's label also communicates to reasonable consumers that the Product should be just as likely or less likely to cause an allergic reaction in its intended users than similar, competing products which also claim to be hypoallergenic.

45. Separately, the term "hypoallergenic" on the Product's label communicates to reasonable consumers that the Product is not a skin sensitizer and does not contain skin sensitizers or allergens in amounts that can cause skin irritation, corrosion, or contact dermatitis or other allergic responses in the Product's intended users.

46. The scientific definition of a skin sensitizer is a substance capable of initiating an immune response in the skin, causing localized or systemic inflammation upon repeated or subsequent exposure.

47. Under the U.S. Occupational Safety and Health Administration's (OSHA) Hazard Communication Standard and the United Nations Globally Harmonized System of Classification and Labelling of Chemicals (GHS), a skin sensitizer is defined as a chemical that will lead to an allergic response following skin contact. OSHA classifies a chemical as a skin sensitizer if there is evidence in humans that the substance can lead to sensitization by skin contact in a substantial number of persons, or if there are positive results from an appropriate animal test.

48. If a skin sensitizer makes up 0.1% or more of a product, or if the product contains a sensitizer that may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical, the *entire* product mixture is classified as a skin sensitizer.

49.    A product that is a skin sensitizer is not hypoallergenic and is not suitable for sensitive skin. Once skin is sensitized, even a *minute* amount of the chemical allergen is enough to cause a full-blown allergic response. Thus, reasonable consumers seeking hypoallergenic products expect that such products do not contain *any* substances which are skin sensitizers according to the above scientific and regulatory definition.

**D.    Product Ingredients Contradicting "Hypoallergenic" and "Pediatrician Recommended" Claims**

50.    Defendant's Product contains substances classified by reputable authorities as skin sensitizers.

51.    Specifically, the Product contains fragrance chemicals. Fragrance is one of the most common allergens and skin irritants, and a leading cause of allergic contact dermatitis according to the AAD. Indeed, the AAD estimates about 2.5 *million* Americans have fragrance allergies.

52.    The Product contains fragrance in an amount that can be reasonably expected to induce an allergic response in a significant number of people, and especially so in the intended customer base.

53.    The risk of contact dermatitis from fragrance chemicals increases for those with compromised skin barriers. Babies, the intended users of the Product, as a whole generally have a compromised skin barrier. Newborn skin is roughly 30 percent thinner than adults. It is also significantly weaker than an adult's, and less capable of natural protection. For babies and individuals with sensitive skin or conditions like eczema, rosacea, or psoriasis, the use of fragranced products can be particularly problematic, exacerbating these conditions over time.

54.    Even when there is no visible redness or rashes after using a product with fragrance chemicals, there may be inflammation at the cellular level and long-term consequences if use is prolonged. With repeated exposure over time, even

individuals who initially tolerate fragranced products may develop allergies or sensitivities, sometimes leading to chronic skin issues.

55.    The role of fragrance in skin care products is limited to aesthetic appeal and masking the natural scent of active ingredients. In other words, fragrance chemicals serve no essential purpose and do not contribute to the efficacy of skin care products in treating or alleviating skin issues.

56.    Because even a *minute* amount of a chemical allergen is enough to cause a full-blown allergic response, Defendant knows that consumers rely upon it to not only test the final product formulation for basic safety, but to select only those ingredients that are known to be safe, and to avoid ingredients that are known, common allergens.

57.    Consumer reviews confirm consumers' surprise and disappointment that the Product Defendant markets as "hypoallergenic," "pediatrician recommended," and for babies' skin would have such a high concentration of fragrance chemicals, and would so routinely cause allergic reactions:

Jordan Nichols

★★☆☆☆ **Fragrance present! Smell is strong.**
Reviewed in the United States on August 31, 2021
Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

My kid has very sensitive skin. We always looks for hypoallergenic products and Vaseline is usually a great choice. I noticed this specific one while browsing ointment options and noticed it was for babies and is hypoallergenic. I didn't do much more investigation, but ordered it since the price point was so low and it was made for sensitive skin in mind. When we received it we immediately opened it to apply to our kid, but the smell took us aback. It is STRONG for being only 0.04% of the formula. It smells like baby powder. After applying, our kid broke out in a full body rash. She didn't sleep well that night.

Amanda

★☆☆☆☆ **If you have Eczema beware!**
Reviewed in the United States on February 23, 2023
Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

I bought this for my son who has horrible eczema because the doctor told me to use Vaseline. I also have eczema on my hands. I don't know how this can possibly be marketed as hypoallergenic when it has a hidden fragrance! Fragrance is horrible for people with skin issues and this made my hands go beat red, crack and start bleeding. I had to wash them vigorously after touching this. My son also had a reaction and had to be wiped down afterwards. Do not use this if you have skin issues.

**russelle catapusan**

★☆☆☆☆ **Not good for baby**

Reviewed in the United States on May 11, 2023

Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

Do not buy if your baby has sensitive skin. My baby had an allergic reaction first time trying baby Vaseline. She has blisters like rashes all over her body where I applied the Vaseline.



**Ellie**

★★☆☆☆ **Not good for baby with sensitive skin**

Reviewed in the United States on January 17, 2025

**Verified Purchase**

It says this product is hypoallergenic, but I would stick to 100% and using their blue label. This product has perfume in it and made my daughter break out. May work for some babies, but if your baby has sensitive skin be aware.!
Read Label

**SGJ**

★☆☆☆☆ **should say "scented" in the product title**

Reviewed in the United States on January 4, 2020

Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

I wish I had read the fine print of the description. Neither the title of the product nor the label on the jar mention the fact that it is scented (except for the ingredients list on the back, which lists "fragrance"). I would not have purchased if I had known — not worth the risk for sensitive skin, and not what I expected from a "hypoallergenic" product.

**Brian**

★★★☆☆ **Has fragrance, not hypoallergenic**

Reviewed in the United States on March 9, 2021

Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

I should have read this more closely, but this product has fragrance, which is a known irritant. Definitely not ideal for a baby's skin.

**Chris B**

★★☆☆☆ **Scented!**

Reviewed in the United States on August 13, 2020

Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

I gave this product 2 stars. Says hypoallergenic but also has fragrance. Unfortunately i didnt know it was scented till we put in on my newborns diaper and he got a rash.

**Neil**

★☆☆☆☆ **Deceitful Label: NOT Hypollergenic!!!**

Reviewed in the United States on July 18, 2021

Size: 13 Ounce (Pack of 4) | Style: Baby | **Verified Purchase**

I bought this because it is labelled "hypoallergenic." The stuff contains "fragrance" as an ingredient. By definition, it's not hypoallergenic. I should add the fragrance smells horrible, like what's used in restroom disinfectant. Don't buy.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                16

**Tiffany Smith**

★☆☆☆☆ **Not hypoallergenic!**

Reviewed in the United States on October 24, 2021

Size: 13 Ounce (Pack of 4) | Style: Baby | Verified Purchase

Just another misleading product… my daughter has severe eczema and Vaseline helps her. But this "baby" formula is just Vaseline with a fragrance which defeats the "hypoallergenic " sales pitch.

**Josie**

★☆☆☆☆ **Warning! Contains fragrance!**

Reviewed in the United States on November 24, 2021

Size: 13 Ounce (Pack of 4) | Style: Baby

This item looks like it's just regular vaseline, but if you read the fine print you can see that it contains fragrance. It takes a special kind of stupid to think it's a good idea to add fragrance to a product meant for baby's sensitive skin. I'm still seething about it, I feel like my baby was assaulted by this product, I can't believe they don't have "scented" written anywhere on the front. And it says hypoallergenic on the front, how is that possible when it has the added fragrance?!

Jan 10, 2021                    ★☆☆☆☆ Verified Purchase ⓘ

**Shylah**

Item details              **Don't use on your babies!!!**

Size: 13 oz               Horrible. I used this on my babies (1 yr old and 8mos) thinking it's safe since it's for babies. Their skin are very sensitive. This broke them out badly. Please don't use this on your babies!!!

Sep 15, 2023                    ★☆☆☆☆ Verified Purchase ⓘ

**Balkees**

Item details              **skin rash**

Size: 13 oz               my baby got skin irritated from it

                          Helpful?  👍 (0)   👎 (0)   |   Report

May 3, 2025               ★☆☆☆☆

**Marziye**             **It has perfume**

                          My baby boy got rashes for 2 months until we recognized they are coming from this product which is scented. Such a rubbish!

Nov 24, 2015              ★☆☆☆☆

**Abcd**                **Bad reaction to fragrance**

                          My daughter had no rash, put baby Vaseline on her and she broke out with a nasty diaper rash. Dermatologist tested my butt. The "fragrance" obviously has reactant components.

**JIAWEN**

★☆☆☆☆ **Don't use. Not recommended by pediatrician**

Reviewed in the United States on December 16, 2024

Size: 13 Ounce (Pack of 4) | Style: Baby | Verified Purchase

I was told today by a demonologist that it's not recommended by them since it added scent. It makes my son's eczema worse.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                17

58. These are but a sample of countless similar consumer reviews. The first ten reviews and the last review reproduced above are from Amazon where Defendant sells the Product through "the Vaseline store." In other words, Defendant itself is the retailer selling the Product on Amazon's platform and, therefore, Defendant has been aware of these and similar consumer reviews. Defendant also monitors and is aware of consumer reviews of its products for purchases made on major third-party retailer sites like www.walmart.com, such as the last four reviews reproduced above.

59. To be clear, fragrance chemicals are permitted in body care products. But Defendant did not simply claim that the Product is lawful to manufacture and sell. Defendant falsely and misleadingly claimed the Product and its ingredients are "hypoallergenic" and "pediatrician recommended" when they are not.

60. Accordingly, Defendant's inclusion of fragrance chemicals in the Product as alleged herein directly contradicts the hypoallergenic claim and the pediatrician recommended claim.

61. In fact, pediatricians and dermatologists strongly favor fragrance-free products for babies, and young children generally with eczema and other sensitive-skin conditions, and advise avoiding added fragrance as a common irritant and potential allergen. The AAP advises using fragrance-free, gentle cleansers and moisturizers and avoiding skin irritants like fragranced soaps and detergents in children with eczema. Similarly, the AAD recommends choosing fragrance-free rather than "unscented" products for children with eczema, noting that even masked fragrances can provoke flares

62. Here, the Product is *more* likely to cause an allergic reaction in babies and users with sensitive skin than Defendant's own Vaseline brand Original Healing Jelly, for example, which contains neither fragrance chemicals nor a "hypoallergenic" representation on its label and packaging:





63.    Ironically, the original Vaseline jelly product is in fact hypoallergenic despite no such claims on its label. But because of Defendant's misleading labeling, consumers are misled into purchasing the Product when comparing it side by side with the original jelly at the store based on the false belief that the Product is less likely to cause an allergic reaction, and is more suitable for sensitive skin, than the original Vaseline jelly product.

64.    The Product is also far more likely to cause an allergic reaction in its intended users than similar, competing products which claim to be hypoallergenic on their labels and, in fact, are hypoallergenic because they omit fragrance chemicals and are pure petrolatum. An example is Walmart's Equate Baby Petroleum Jelly, which has a "Hypoallergenic" claim on its front label, is designed for use on babies, is comprised of 100% White Petrolatum, and contains zero fragrance chemicals or other skin sensitizers:



65. Another example is Target's Up & Up Petroleum Jelly, which also claims to be "Hypoallergenic" on its front label and contains no fragrance chemicals or other skin sensitizers:



**E.      The "Pediatrician Recommended" Claim**

66.     As alleged above, consumers generally interpret a label claim like "Pediatrician Recommended" as a strong endorsement of safety and efficacy from medical experts, implying that many pediatricians have specifically evaluated and favor that product for babies and children with sensitive skin over other available, competing products.

67.     There is no study or evidence, however, suggesting a pediatrician has ever recommended the Product to consumers.

68.     In fact, pediatricians and dermatologists strongly favor fragrance-free products for babies and children with eczema and other sensitive-skin conditions, and advise avoiding added fragrance as a common irritant and potential allergen for *all* baby products. The AAP advises using fragrance-free, gentle cleansers and moisturizers and avoiding skin irritants like fragranced soaps and detergents in children with eczema. Similarly, the AAD recommends choosing fragrance-free rather than "unscented" products for children with eczema, noting that even masked fragrances can provoke flares.

**F.      Consumer Deception**

69.     Defendant's conduct alleged herein deceived and continues to deceive the public into believing the Product is hypoallergenic and recommended by pediatricians, as labeled.

70.     These representations were and continue to be false, as explained *supra*.

71.     Consumers would not know the true nature of the Product by looking at the front labels of the Product. There is nothing on the front label (like an asterisk) disclaiming or modifying the "hypoallergenic" or "pediatrician recommended" representations. The "hypoallergenic" and "pediatrician recommended" representations are not ambiguous or vague to reasonable consumers such that they would reasonably think or be expected to investigate the representations further before purchasing the Product.  Further, consumers are overall less likely to look at ingredient lists on personal care products than for food, which consumers believe to have a more immediate and direct impact on their health.

72.     Consumers lack the ability to test or independently ascertain the potential for allergic contact dermatitis or skin sensitivities at the point of sale. Consumers also have no basis to know whether a product has in fact been "pediatrician recommended" at the point of sale. Reasonable consumers must and do rely on Defendant to honestly report the nature of the Product and its ingredients.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                    24

73. Defendant made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Product.

74. Defendant repeated the above false, deceptive, and misleading misrepresentations and omissions on its online product page for the Product, and product pages at other online retailers such as Amazon, Walmart, Target, etc.

75. The misrepresentations and omissions were consistent and uniform during the last four years, and have actually been communicated to Plaintiff and to each member of the proposed classes at every point of purchase and consumption.

76. Defendant deceptively and misleadingly conceals material facts about the Product, including:

  a. the true nature of the Product's formulation and effect;

  b. that the Product contains allergens/sensitizers/irritants;

  c. the identity and concentration of the allergens/sensitizers/irritants in the Product;

  d. that the Product is not "hypoallergenic";

  e. that the Product is not what a reasonable consumer would consider to be "hypoallergenic";

  f. that the Product contains chemicals that a reasonable consumer would not expect in a product labeled as "hypoallergenic"; and

  g. that the Product is not "Pediatrician Recommended," and that pediatricians generally advise against the use of products with fragrance for babies and children with skin sensitivities.

77. Plaintiff and the members of the proposed classes are not at fault for failing to discover Defendant's wrongs earlier and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

78. To this day, Defendant continues to conceal and suppress the fact that the Product is not "hypoallergenic" or "pediatrician recommended" as promised.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP    25

79.    Defendant represents elsewhere in online marketing that the Product is "gentle on skin," "a gentle and pure skin care moisturizer that helps treat and prevent chafed skin from diaper rash," "a trusted skin care product that adds a soothing and protective barrier to help relieve baby's discomfort," and "gentle enough to treat dry skin on baby's face and body." These representations further obscure the fact that the Product is not hypoallergenic or recommended by pediatricians.

80.    Defendant holds itself out to the public as a trusted expert in the area of hypoallergenic, safe, mild, and gentle personal care products.

81.    Defendant knew what representations it made regarding the Product, and Defendant knew what ingredients it added to the Product.

82.    Defendant also knew sufficient facts demonstrating that its Product contains allergens/sensitizers/irritants in sufficient quantities to cause skin irritation or corrosion or contact dermatitis in its intended users, and that the Product was therefore falsely labeled.

83.    For example, Defendant is aware of countless consumer complaints spanning over a decade about the Product on public fora and in retailer reviews. These consumers bemoan being misled by Defendant's "hypoallergenic" claim after learning the Product has a strong fragrance and caused allergic reactions in them and their children. Some consumers complain their dermatologists actually recommending *against* the Product due to the added scent after it made eczema symptoms worse.

84.    As Defendant knows, consumers prefer hypoallergenic products, especially those with sensitive skin or who have babies or children with sensitive skin, eczema, or other skin conditions. As Defendant knows, consumers will pay a premium for hypoallergenic products or may choose not to purchase certain products at all unless they were truly hypoallergenic, as advertised. As Defendant knows, consumers attribute additional value to a product they perceive has been recommended by the very medical professionals who specialize in treating children.

85.    In making the false, misleading, and deceptive representations and omissions at issue: (a) Defendant intended Plaintiff and proposed class members to rely upon these representations and omissions in purchasing and using the Product; (b) Defendant knew and intended that consumers would purchase the Product when consumers would otherwise purchase a competing product; and (c) Defendant knew and intended that consumers would pay a premium for hypoallergenic and pediatrician recommended products. Defendant's conduct furthered its private interest of increasing sales of its products and decreasing the sales of products marketed by its competitors.

86.    With respect to the Product, Defendant knew some of the most important, material label representations to consumers are the statements that the Product is "hypoallergenic" and "Pediatrician Recommended." Defendant made these prominent statements with knowledge that they are false and/or misleading to reasonable consumers. By deceiving consumers about the nature, quality, and/or ingredients of its Product, Defendant was and continues to take away market share from competing products and command a price premium, thereby increasing its own sales and profits.

87.    For example, despite selling a nearly identical product with a "hypoallergenic" claim, Walmart and Target exclude fragrance chemicals in their Equate Baby Petroleum Jelly and Up & Up Petroleum Jelly products. These products are also sold for lower prices than the Product on a per ounce basis.

88.    The average price per ounce of the Product is $0.42 - $1.09 depending on the size of the container, with smaller tubes often priced higher on a per ounce basis than the larger tubs, and multi-packs often priced lower on a per ounce basis than single units. Some retailers sell the Product for as high as $2.75 per ounce or much more. Meanwhile, the average price of Walmart's Equate product is $0.18 - $0.20 per ounce, and the average price of Target's Up & Up product is $0.32 per ounce.

89.     To illustrate, in November 2025 on www.walmart.com, a single 2.5 oz tube of Walmart's Equate product cost $1.88, while a single 2.89 oz tube of Defendant's Product had a reference price of $10.50 but was on sale for $4.13. These differences in price remained relatively consistent historically as well. Any historical deviation in the price ratio resulted in an even wider price gap.

90.     For example, at Walmart, Walmart's Equate product ranged from $1.74 to $1.88 per 2.5 oz tube between March 2023 and November 2025, while Defendant's Product ranged from $4.13 to $7.49. Over the same period, third party sellers routinely sold the Product for between $7.00 and $10.00 per 2.5 oz tube, and in extreme cases much higher. On www.amazon.com, for example, between March 2023 and November 2025, the same single 2.89 oz tube of Defendant's Product had an average price of $7.57.

91.     Likewise, in November 2025 on www.target.com, a single 7.5 oz tub of Target's Up & Up product cost $2.39, while a single 13 oz tub of the Product cost $5.79.

92.     The difference in relative prices for the Product and the competing products referenced herein were consistent throughout the prior four years both online and at physical stores.

93.     Defendant deceptively and misleadingly conceals other material facts about the Product, including: (a) the true nature of the Product's ingredients; (b) that the Product contains chemicals commonly known to be allergens, sensitizers, and/or irritants; (c) that the Product is not "hypoallergenic," and not what reasonable consumers would consider "hypoallergenic"; (d) that the Product contains chemicals that a reasonable consumer would not expect in a product labeled "hypoallergenic"; and (e) that the Product is "Pediatrician Recommended."

94.     To this day Defendant continues to conceal and suppress the existence, identity, nature, and concentration of fragrance chemicals in the Product.

95.    Similarly, to this day, Defendant continues to conceal and suppress the fact that the Product is not "hypoallergenic" or "Pediatrician Recommended" as promised.

96.    When Plaintiff and the proposed class members purchased the Product, Plaintiff and the proposed class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

97.    These misrepresentations were uniform and were communicated to Plaintiff and the proposed class members at every point of purchase and consumption.

98.    Notably, the "hypoallergenic" statement is not disclaimed or modified anywhere on the Product's label or marketing. No asterisk or marking appears by the words "hypoallergenic" that would suggest to a reasonable consumer that they need to look elsewhere on the label to understand the true meaning. Because the "hypoallergenic" statement appears effectively as one of the main claims on the front of the label of the Product, reasonable consumers interpret it at face value.

99.    Likewise, consumers interpret "Pediatrician Recommended" at face value.

100.    Plaintiff and the proposed class members were among the intended recipients of Defendant's deceptive representations and omissions.

101.    Plaintiff and the proposed class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

102.    Defendant's false, misleading, and deceptive misrepresentations and omissions deceived and misled Plaintiff and the proposed class members, and continue to mislead reasonable consumers and the public.

103.    Defendant's misleading affirmative statements further obscured what it failed to disclose. Thus, reliance upon Defendant's misleading and deceptive representations and omissions may be presumed.

104. Defendant made the deceptive representations and omissions with the intent to induce Plaintiff and the proposed class members to purchase the Product. Plaintiff's and the proposed class members' reliance upon such representations and omissions may be presumed.

105. Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff's and the proposed class members' reliance upon such representations and omissions may be presumed as a matter of law. The materiality of those representations and omissions also establishes causation between Defendant's conduct and the injuries sustained by Plaintiff and the proposed class members.

106. Defendant knew or should have known that reasonable consumers would consider the representations material in deciding to purchase the Product.

107. Defendant knew or should have known that the representations could plausibly deceive reasonable consumers into believing that the Product is hypoallergenic and suitable for sensitive skin and contains no known, common allergens.

108. Reasonable consumers: (a) ascribe a common meaning to words on product labels; (b) rely on product labels for their truth and accuracy; (c) are not required to conduct independent research to determine the truth of label statements; and (d) are not expected to look beyond misleading representations on the front label of a product or in marketing materials to determine whether they are false.

109. Instead, it is the responsibility of product manufacturers to accurately label their products in a manner that is not misleading.

110. Even a perfectly true statement that is couched in a manner that is likely to mislead or deceive consumers is actionable.

111.    Plaintiff and reasonable consumers reasonably believed that the prominent front label statements that the Product is hypoallergenic and recommended by pediatricians were true.

112.    As described herein, Defendant's front label statements are false.

113.    Accordingly, there is no "common sense" interpretation of the representations that would overcome their falsity.

**G.    Injuries and Damages**

114.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and putative class members in that they:

    a.  paid a sum of money for a product that was not as represented;

    b.  paid a premium price for a product that was not as represented;

    c.  were deprived the benefit of the bargain because the Product they purchased was different from what Defendant warranted;

    d.  were deprived the benefit of the bargain because the Product they purchased had less value than what was represented;

    e.  did not receive a product that measured up to their expectations as created by Defendant;

    f.  used (or caused their children to use) a substance that Plaintiffs and the proposed class members did not expect or consent to;

    g.  used (or caused their children to use) a product that was not hypoallergenic;

    h.  without their knowing consent, used (or caused their children to use) a substance that is likely to cause an allergic reaction and is generally harmful to their health or their children's health; and

    i.  without their knowing consent, used (or caused their children to use) a substance that is itself a skin sensitizer per scientific and regulatory definitions.

115. Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the proposed class members would not have been injured as listed above.

116. Accordingly, Plaintiff and the proposed class members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

117. As the intended, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant has been unjustly enriched through more sales of the Product and higher profits at the expense of Plaintiff and the proposed class members. As a direct and proximate result of its deception, Defendant also unfairly obtained other benefits, including the higher value associated with a "hypoallergenic" and "pediatrician recommended" product or brand and the resulting higher stock value, redirecting sales to it and away from its competitors, and increased sales of its other products.

118. On December 30, 2025, Plaintiff served a written demand for relief via electronic mail to Defendant's counsel of record in this litigation, which was accepted as effective service by Defendant's counsel, and which was at over 30 days prior to the filing of this amended complaint.

## CLASS ACTION ALLEGATIONS

119. **Class Definition**: Plaintiff brings this action on behalf all people in the following class (collectively referred to as "Class Members"):

   a. <u>California Class</u>: all people in California who purchased the Product for personal or household use during the four years preceding the date on which Plaintiff filed her original Complaint.

120. Subject to additional information obtained through further investigation and discovery, the foregoing class definition may be expanded or narrowed by amendment or in the motion for class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

121.    Excluded from the putative class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family. Also excluded are any claims for personal injury.

122.    ***Numerosity****.* Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, the California Class includes thousands of consumers. The precise number of Class Members and their identities are unknown to the Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant, its agents, or other means.

123.    ***Commonality and Predominance.*** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

   a.  Whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

   b.  Whether the omissions and representations on the Product's label and the Product's marketing materials, or any single omission or representation, is false, misleading, and/or deceptive;

   c.  Whether Defendant's conduct in advertising and selling the Product amounted to unlawful, unfair, and/or deceptive business practices;

   d.  Whether Defendant breached an express and/or implied warranty created through the labeling and marketing of its Product;

   e.  Whether Plaintiff and the Class Members are entitled to equitable and/or injunctive relief;

   f.  Whether Plaintiff and the Class Members have sustained damage as a result of Defendant's unlawful conduct;

g. The proper measure of damages sustained by Plaintiff and the Class Members; and

h. Whether Defendant was unjustly enriched by its unlawful practices.

124. **Typicality**. The claims of the Plaintiff are typical of the claims of the Class Members in that Plaintiff and the Class Members sustained damages as a result of Defendant's uniform wrongful conduct, as alleged above.

125. **Adequacy**. Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the classes. Plaintiff has no interests that are antagonistic to those of the Class Members. Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed Class Members.

126. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for Class Members; the Class Members are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

127. Defendant has acted or failed to act on grounds generally applicable to the Class Members, thereby making appropriate final injunctive relief with respect to the Class Members as a whole.

128. Without a class action, Defendant will continue a course of action that will result in further damages to the Plaintiff and Class Members and will likely retain the benefits of its wrongdoing.

## COUNT I

### Violation of California's Unfair Competition Law ("UCL")

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

129. Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

130. Plaintiff brings this cause of action individually and on behalf of all other class members in the California Class.

131. California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

132. Defendant acted with knowledge and intent.

133. Plaintiff alleges a claim under all three prongs of the UCL.

134. As alleged above, Defendant engaged in fraudulent conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

135. Defendant's conduct also constitutes "unfair" business acts and practices within the meaning of the UCL, in that its conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Defendant's violation of consumer protection and unfair competition laws resulted in harm to consumers.

136. Plaintiff also alleges a violation under the "unlawful" prong of the UCL because Defendant's conduct violated consumer protection laws and the common law as set forth herein.

137. As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and the other members of the California Class have suffered and will continue to suffer out-of-pocket losses.

138. Plaintiff and class members in the California Class have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendant alleged herein, and they

lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and class members in the California Class are inadequate because they are not equally prompt, certain, or efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

139.   Equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product are determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff and members of the California Class would be left without the parity in purchasing power to which they are entitled.

140.   Plaintiff seeks all relief available under the UCL.

**COUNT II**

**Violation of California's False Advertising Law**

**Cal. Bus. & Prof. Code. §§ 17500, et seq.**

141.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

142.    Plaintiff brings this cause of action individually and on behalf of all other class members in the California Class.

143.    Defendant violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 by engaging in the conduct alleged above.

144.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

145.    Defendant knew or should have known that its conduct was false and/or misleading.

146.    Defendant knew or should have known that its conduct was false and/or misleading.

147.    Plaintiff lacks an adequate remedy at law for the reasons already alleged above in connection with the UCL claim.

148.    Plaintiff and members in the California Class have suffered harm as a result of Defendant's violations of the FAL.

149.    Plaintiff seeks all available relief under the FAL.

## COUNT III

## Violations of California's Consumer Legal Remedies Act ("CLRA")

## Cal. Civ. Code §§ 1750, *et seq.*

150.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

151.    Plaintiff brings this cause of action individually and on behalf of all other class members in the California Class.

152.    Defendant is a "person" as defined by California Civil Code § 1761(c).

153. Plaintiff and the other members in the California Class are "consumers" within the meaning of California Civil Code § 1761(d).

154. For the reasons alleged above, Defendant violated California Civil Code § 1770(a)(5)(7) and (9).

155. Plaintiff provided pre-suit notice of the claims asserted under the CLRA via certified mail, return receipt requested, in compliance with all of the CLRA's requirements.

156. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business.

157. Defendant acted with knowledge and intent.

158. As alleged above, Defendant engaged in conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

159. With respect to the CLRA claim, Plaintiff alleges in the alternative that she lacks an adequate remedy at law for the reasons already alleged above in connection with the UCL claim.

160. As a result of Defendant's misconduct, Plaintiff and members of the California Class have suffered monetary harm.

161. Plaintiff seeks all relief available under this cause of action, including damages.

## COUNT IV

### Breach of Implied Warranty

162. Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

163. Plaintiff brings this cause of action individually and on behalf of the California Class against Defendant.

164. Plaintiff asserts this cause of action under California law.

165.  Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Product was specially formulated to be "hypoallergenic," when that is not true.

166.  Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Product was recommended by pediatricians for its intended purpose, when that is not true.

167.  Defendant breached its warranty implied in the contract for the sale of the Product because it could not pass without objection in the trade under the contract description: the Product was not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiff and members of the California Class, and the Product does not conform to the implied affirmations of fact made on the marketing and packaging for the Product. U.C.C. §§ 2-313(2)(a), (e), (f). As a result, Plaintiff and members of the California Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

168.  Plaintiff and members of the California Class purchased the Product in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

169.  The Product was defective when it left the exclusive control of Defendant.

170.  Plaintiff and members of the California Class did not receive the goods as warranted.

171.  As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and members of the California Class have been injured and harmed because: (a) they would not have purchased the Product on the same terms if they knew that the Product was not hypoallergenic; and (b) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

172.  Plaintiff seeks all available relief under this cause of action.

## COUNT V

### Breach of Express Warranty

173.   Plaintiff reallege and incorporate the above allegations by reference as if set forth fully herein.

174.   Plaintiff brings this cause of action individually and on behalf of the California Class against Defendant.

175.   Plaintiff asserts this cause of action under California law.

176.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the products at issue, expressly warranted that the Product was "hypoallergenic," when that is not true. The warranty was part of the description of the goods and the bargain upon which the goods were offered for sale.

177.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Product was recommended by pediatricians for its intended purpose, when that is not true.

178.   By falsely representing that the Product was hypoallergenic and recommended by pediatricians, Defendant breached its express warranty.

179.   Plaintiff and members of the California Class did not receive the goods as warranted.

180.   As a direct and proximate cause of Defendant's breach of the express warranty, Plaintiff and members of the California Class have been injured and harmed because: (a) they would not have purchased the Product on the same terms if they knew that the Product was not hypoallergenic; and (b) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

181.   Plaintiff seeks all available relief under this cause of action.

## COUNT VI

### Unjust Enrichment

182.   Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                    40

183.    Plaintiff brings this cause of action individually and on behalf of all other Class Members against Defendant.

184.    Plaintiff asserts this cause of action under the laws of California.

185.    To the extent required, Plaintiff asserts this cause of action in the alternative to legal claims, as permitted by Rule 8.

186.    Plaintiff and the Class Members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

187.    Defendant knew of the benefit conferred on it by Plaintiff and the Class Members.

188.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class Members' purchases of the Product, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Product was not hypoallergenic and omitted that pediatricians did not in fact recommend the Product for its intended use. This caused injuries to Plaintiff and Class Members because they would not have purchased the Product or would have paid less for it if the true facts concerning the Product had been known.

189.    Defendant accepted and retained the benefit in the amount of the gross revenues derived from sales of the Product to Plaintiff and Class Members.

190.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

191.    Plaintiff and Class Members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Product.

192.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered in an amount to be proven at trial.

193.    Putative Class Members have suffered an injury in fact and have lost money as a result of Defendant's unjust conduct.

194.    Putative Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

## COUNT VII

**Fraud by Omission / Intentional Misrepresentation**

195.    Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

196.    Plaintiff brings this cause of action individually and on behalf of all other Class Members against Defendant.

197.    Plaintiff asserts this cause of action under the laws of California.

198.    This claim is based on fraudulent omissions concerning the ingredients of the Product and the fact that it is not hypoallergenic or recommended by pediatricians as alleged herein. As discussed above, Defendant failed to disclose: (a) the true nature of the Product's ingredients; (b) that the Product contains chemicals commonly known to be allergens, sensitizers, and/or irritants; (c) that the Product is not "hypoallergenic" and not what reasonable consumers would consider "hypoallergenic"; (d) that the Product contains chemicals that a reasonable consumer would not expect in a product labeled "hypoallergenic"; and (e) that the Product is "Pediatrician Recommended."

199.    The false and misleading omissions were made with knowledge of their falsehood. Defendant knew the true nature of the Product and its ingredients. Nonetheless, Defendant continued to sell the Product using the false and misleading omissions alleged herein to unsuspecting consumers.

200.    The false and misleading omissions were made by Defendant, upon which Plaintiff and Class Members reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class Members to purchase the Product.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP            42

201.    The fraudulent actions of Defendant caused injury to Plaintiff and Class Members, who are entitled to damages and punitive damages.

202.    Plaintiff seeks all relief available under this cause of action.

## PRAYER FOR RELIEF

203.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

A.    For an order certifying the classes and naming Plaintiff as the representative;

B.    For an order declaring Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff and the classes on all counts asserted herein;

D.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiff and the classes their reasonable attorney fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Per Fed. R. Civ. P. 38(b), Plaintiff requests a jury trial on all issues so triable.

Dated:  February 13, 2026        Respectfully submitted,

*/s/ Yeremey O. Krivoshey*

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey, Esq. (California Bar No. 295032)
yeremey@skclassactions.com
Brittany S. Scott, Esq. (California Bar No. 327132)

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                43

brittany@skclassactions.com
28 Geary Street, Suite 650 # 1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: 888-410-0415

**SMITH KRIVOSHEY, PC**
Joel D. Smith (California Bar No. 244902)
joel@skclassactions.com
Aleksandr Litvinov (State Bar No. 95598)
(*pro hac vice*)
sasha@skclassactions.com
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404

Michael Robert Reese
**REESE LLP**
100 West 93rd Street
Ste 16th Floor
New York, NY 10025
212-643-0500
Email: mreese@reesellp.com

Trenton Ross Kashima
**BRYSON HARRIS SUCIU & DEMAY PLLC**
19800 MacArthur Blvd.
Suite 270
Irvine, CA 92612
212-946-9389
Email: tkashima@brysonpllc.com

J. Hunter Bryson (*pro hac vice* forthcoming)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
919-539-2708
Email: hbryson@brysonpllc.com

Nick Suciu III (*pro hac vice* forthcoming)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Email: NSuciu@brysonpllc.com

*Attorneys for Plaintiff*

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 2:24-cv-03017-DJC-JDP                    44

**<u>CLRA Venue Declaration, Civil Code § 1780(c)</u>**

I, Yeremey O. Krivoshey, declare as follows:

I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify hereto.

I am the attorney for Plaintiff in the above-captioned action.

I submit this declaration in support of the Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code § 1750 *et seq.*

The Class Action Complaint has been filed in the proper place for trial of this action.

It is my understanding that Defendant regularly transacts business in Stanislaus County, and the acts and omissions giving rise to this action occurred in large part in Stanislaus County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on February 13, 2026 in Louisville, KY.

By:  */s/ Yeremey O. Krivoshey*

Yeremey O. Krivoshey